**NORTHERN INDIANA PUBLIC SERVICE COMPANY (NIPSCO), Appellant,**

v.

**LaPORTE, Indiana County Board of Commissioners and City Of Michigan City, Indiana, Appellees,**

**United States Steel Workers of America, Office Of Utility Consumer Counselor, County Of Lake, And Lake County Council, Intervenors.**

Nos. 93A02–0205–EX–369, 46A05–0203–CV–137.

Court of Appeals of Indiana.

July 15, 2003.

David C. Jensen, Paul A. Rake, Louis W. Voelker, Eichhorn & Eichhorn, Hammond, IN, Attorneys for Appellant.

Rick D. Doyle, Robert W. Wright, Doyle, Wright & Dean–Webster, LLP Greenwood, IN, Shaw R. Friedman, Friedman & Associates, P.C. LaPorte, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

In this consolidated appeal, Northern Indiana Public Service Company ("NIPSCO") appeals orders of the Indiana Utility Regulatory Commission ("IURC") and a preliminary injunction issued by the LaPorte County Superior Court ("trial court") enjoining it from closing and consolidating several Local Operating Areas ("LOAs") until the IURC conducts a preliminary investigation.

We affirm.[1]

### ISSUES

1. Whether the petitioners had standing to challenge NIPSCO's planned closure of its LOAs.
2. Whether the IURC erroneously issued its order enjoining NIPSCO.
3. Whether the trial court had jurisdiction to issue a preliminary injunction in aid of the IURC.

### FACTS

NIPSCO is a public utility incorporated in Indiana providing electric and natural gas service to thirty (30) counties in northern Indiana. Throughout certain counties, NIPSCO maintains LOAs that contain equipment and supplies used by road crews to repair and maintain its electric and gas utilities. NIPSCO employees working out of these LOAs are represented by their collective bargaining unit, the United Steelworkers of America.

On January 16, 2002, NIPSCO sent letters to the Indiana Department of Workforce Development and the United Steelworkers of America informing them that it planned to close and consolidate certain LOAs in Lake, LaPorte, Marshall, and LaGrange counties. As a result, a certain number of NIPSCO employees would also lose their jobs. In order to maintain customer service, NIPSCO planned to dispatch repair personnel from their homes. NIPSCO's consolidation plan was to begin on or about March 18, 2002 and be completed by the end of May 2002.

On March 8, 2002, the LaPorte County Board of Commissioners and the City of Michigan City ("the Petitioners") filed an emergency petition with the IURC asking it to enjoin NIPSCO from acting on its consolidation plan and to conduct an IURC investigation. The Petitioners alleged that NIPSCO's LOAs contained "critical emergency response equipment" and crews that respond to power outages and emergencies. (App.I, p. 6).[2] As a result, the Petitioners alleged that closing and consolidating these LOAs would constitute an unsafe practice or act substantially increasing the area and response times of crews and unnecessarily jeopardizing public safety and customer service. On March 11, 2002, the Petitioners also filed a complaint in the trial court seeking to preliminarily and permanently enjoin NIPSCO from implementing its consolidation plan.

On March 15, 2002, and prior to holding a hearing, the IURC issued an order requiring NIPSCO to "cease taking any actions in furtherance of its planned maintenance office closings and service district expansion" until a preliminary review was completed. (App.I. p. 29). The IURC scheduled a Prehearing Conference and

---

1. On May 29, 2003, we held oral argument in this matter. We would like to thank the parties for their presentations.

2. App. I refers to NIPSCO's appendix filed under cause number 93A02–0205–EX–369. App. II refers to NIPSCO's appendix filed under cause number 46A05–0203–CV–137.

Preliminary Hearing for April 10, 2002. On March 15, 2002, the trial court also held a hearing on the Petitioners' complaint. At the hearing, the Lake County Board of Commissioners, Lake County Council, and the United Steelworkers of America intervened on behalf of the Petitioners. NIPSCO filed a motion to dismiss the Petitioners' complaint, but before evidence was heard, it entered into negotiations with the Petitioners. NIPSCO and the Petitioners emerged from negotiations having entered into a stipulated agreement. The stipulation stated that if the trial court found it had jurisdiction, NIPSCO would restore the LOAs "to the status quo which existed on March 1, 2002, . . . ." (App.II, p. 18). As a result, the trial court dismissed NIPSCO's motion to dismiss, found that it had the jurisdiction to issue an injunction in aid of the IURC's March 15, 2002 order, and issued a preliminary injunction. The trial court stated that the injunction's duration was "subject to the duration of the administrative processes before the [IURC] . . . to resolve . . . whether NIPSCO's plan for consolidation of its maintenance services satisfies its statutory and regulatory obligations as a public utility, . . . ." (App.II, p. 15). In addition, the trial court noted that NIPSCO "had taken significant action between March 8 and March 15, 2002[ ] to implement the closure of" its LOAs. (App.II, p. 9).

On March 22, 2002, NIPSCO filed its notice of appeal from the trial court's judgment granting the Petitioners a preliminary injunction. On March 26, 2002, NIPSCO also filed its notice of appeal from the IURC's order issued March 15, 2002. NIPSCO also filed motions to vacate and dismiss with the IURC asking it to review the order enjoining the implementation of NIPSCO's consolidation plan.

On April 10, 2002, the IURC held a Prehearing Conference and Preliminary Hearing. At the hearing, Richard Essig ("Essig"), a NIPSCO employee and Vice–President of the United Steelworkers Local 12775, testified that NIPSCO's customer base has continued to increase while the number of employees has declined. Essig also stated that NIPSCO's plans to dispatch repair crews from their homes was not feasible because the larger equipment needed for repairs must still be stored at secure, enclosed facilities. Mark Donaldson ("Donaldson"), Deputy Chief of the Michigan City Fire Department, stated that NIPSCO's response time to emergency calls had increased since it closed its Michigan City repair facility in 1996. Further, Mike Sandy, a NIPSCO gas serviceman, testified that NIPSCO's consolidation plan would significantly increase the response time to repair gas leaks because the equipment, such as backhoes, trenchers, and gas clamps, is kept at the LOAs. John Goble ("Goble"), Chief Executive Officer of LaPorte Regional Health Systems, stated that NIPSCO provides essential service to area hospitals. Goble also gave testimony concerning a power failure that occurred in January 2002 when the LaPorte city hospital was forced to operate on its backup generators for over an hour before NIPSCO could restore power.

Timothy Dehring ("Dehring"), a NIPSCO manager, testified that the consolidation plan was designed to improve efficiency by eliminating underutilized LOAs and duplication of certain internal support positions. Dehring stated that NIPSCO had drawn up smaller geographic areas that would be covered by repair personnel who bid to cover those areas. Robert Schacht ("Schacht"), Vice–President and Chief Operating Officer of NIPSCO, said that the consolidation plan and redeployment of personnel was a "reasonable business decision." (Tr. 181). Michael Bechdol ("Bech-

dol"), a NIPSCO field manager, testified that the power outage at the LaPorte city hospital occurred because ice-laden trees had fallen on power lines. Bechdol also stated that hospitals are given top priority when restoring service.

At the conclusion of the preliminary hearing, the administrative law judge denied NIPSCO's motions to vacate and dismiss the March 15, 2002 order. The administrative law judge ruled that its order would remain in effect "pending further order of the Commission that will be issued following the conclusion of a full evidentiary hearing in this matter." (Tr. 197). Immediately thereafter, NIPSCO's counsel appealed the administrative law judge's denial of its motions to the full Commission. The IURC subsequently voted to uphold its rulings on NIPSCO's motions. A formal evidentiary hearing was scheduled for June 23–24, 2003.

On April 24, 2002, the IURC entered judgment adopting the order issued on March 15, 2002. NIPSCO subsequently filed its notice of appeal on April 29, 2002. In addition, NIPSCO filed motions to stay the IURC's March 15, 2002 order, and the trial court's preliminary injunction, and to consolidate the three appeals. On January 27, 2003, the Court of Appeals found the IURC's March 15, 2002 order to be a temporary restraining order and not appealable by right under Indiana Appellate Rule 14(A)(5). As a result, that appeal was dismissed, but NIPSCO was allowed to raise the issues concerning the March 15, 2002 order in its two remaining appeals that have been consolidated herein.

### DECISION

1. *Standing*

▮ NIPSCO appeals the IURC's issuance of its March 15 and April 24, 2002 orders enjoining NIPSCO from imple-

menting its consolidation plan. Specifically, NIPSCO argues that the Petitioners did not have standing to challenge its consolidation plan because the plan had not yet been implemented.

▮ The interpretation of a statute is a question of law reserved for the courts. *Hancock County Rural Elec. v. Greenfield*, 768 N.E.2d 909 (Ind.Ct.App.2002). We will not interpret a statute that is clear and unambiguous on its face. *Murray v. Conseco, Inc.*, 766 N.E.2d 38 (Ind.Ct.App. 2002). "Rather, words are to be given their plain, ordinary, and usual meaning unless a contrary purpose is clearly shown by the statute itself." *Id.* at 41.

Indiana Code § 8–1–2–54 reads:

Upon a *complaint* made against any public utility by any mercantile, agricultural or manufacturing society or *by any body politic or municipal organization* or by ten (10) persons, firms, limited liability companies, corporations, or associations, or ten (10) complainants of all or any of the aforementioned classes, or by any public utility, that any of the rates, tolls, charges or schedules or any joint rate or rates in which such petitioner is directly interested are in any respect unreasonable or unjustly discriminatory, or that any regulation, measurement, *practice or act* whatsoever affecting or relating to the service of any public utility, or any service in connection therewith, is in any respect *unreasonable, unsafe, insufficient or unjustly discriminatory, or that any service is inadequate* or can not be obtained, the commission shall proceed, with or without notice, to make such investigation as it may deem necessary or convenient. But no order affecting said rates, tolls, charges, schedules, regulations, measurements, practice or act, complained

of, shall be entered by the commission without a formal public hearing.

(emphasis added).

Here, the statute clearly and unambiguously states that any body politic or municipal organization may make a complaint to the IURC regarding a practice or act of a public utility. As a result, we find that the petitioners have standing.

## 2. Statutory Authority of IURC

NIPSCO argues that the IURC's order issued on March 15, 2002 enjoining it from taking any further action to consolidate its operations was erroneous because (1) the IURC does not have statutory authority to issue an injunction or restraining order; (2) there was insufficient evidence to support the order; and (3) the IURC's order unnecessarily interferes with its internal operations. In addition, NIPSCO argues that it did not consent to the suspension of its consolidation plan, and that the IURC did not make a finding that an emergency existed in order to suspend its consolidation plan, as required under Indiana Code § 8–1–2–113.

In addressing NIPSCO's arguments, we are mindful that the tension between government regulation and free market economic theory is as old as the Republic; it will also continue to be a part of this court's decisions concerning the IURC and the public utilities they regulate. This is because defining the concept of a public utility in American law involves the struggle to define which businesses affect the public interest to such a degree as to warrant government regulation and which businesses should be left to operate under *laissez-faire* economic theory. Gustavus H. Robinson, *The Public Utility Concept in American Law*, 41 HARV. L.REV. 277 (1928); see also *Wolff Packing Co. v. Court of Industrial Relations*, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103 (1923) (dividing businesses into three classes that affect the public interest).

Public service commissions, the administrative agencies tasked with regulating public utilities, were born out of a period in American history when the judiciary looked upon social and economic reform legislation with suspicion. This period of "judicial clubbing" is marked by the United States Supreme Court's decision in *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), in which the Court, while recognizing the police powers of the states, held that a New York state statute limiting the number of hours bakers could work in a given week was an unreasonable exercise of its police power and an unconstitutional interference with an individual's right to contract with an employer. However, the Court was not as active in its zeal to restrict a state's use of its police power to regulate railroads as public utilities. *See, e.g. Chicago, B. & Q.R. Co. v. State ex rel. City of Omaha*, 170 U.S. 57, 18 S.Ct. 513, 42 L.Ed. 948 (1898) (holding that railroad companies, which are corporations created for a public purpose, are not insulated from police power of states, and that their contracts can be modified or annulled by state statute). Even so, three decades later, Congress had enacted the Sherman Antitrust Act (prohibiting establishment of monopolies by price fixing), the Federal Trade Commission Act (establishing administrative agency to prevent unfair competition), and the Clayton Act (prohibiting price discrimination, exclusive arrangements, and stock-purchase mergers of holding companies). As a result, the Court seemed to recognize that changes in social and economic conditions warranted a reconsideration of its prior decisions regarding the states' exercise of its police powers to regulate businesses. Tony A. Freyer, *Antitrust Legislation, in* The Oxford Compan-

ion to United States History 45–46 (Paul S. Boyer ed., 2001). Upholding a Washington statute that established a minimum wage for women working in hotels, the Court stated that there was no absolute right to contract, and that a person's liberty often "requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people." *West Coast Hotel v. Parrish*, 300 U.S. 379, 391, 57 S.Ct. 578, 581, 81 L.Ed. 703 (1937).

It is against this backdrop that states have established public service commissions to regulate public utilities. Jacob Geffs, *Statutory Definitions of Public Utilities and Carriers*, 12 Notre Dame L.Rev. 246 (1937). Indiana enacted its Public Utility Act, which is patterned after the Public Utility Act of Wisconsin, in 1913. *Wabash Valley Electric Co. v. Singleton*, 1 F.Supp. 106, 109 (S.D.Ind.1932). The Act created a public service commission to which a municipality, its citizens, or the utility itself could petition for an adjustment in the schedule of rates for electricity. *Id.*

█ In 1987, the name of the commission was changed to the Indiana Utility Regulatory Commission ("IURC"). Ind. Pub.L. 113–1987, § 3. In its current form, the Act grants the IURC authority to initiate investigations into a public utility's practices or acts affecting its service that are unreasonable, unsafe, insufficient, discriminatory, or inadequate. Ind.Code § 8–1–2–54. Such an investigation may be summarily conducted with or without notice. Ind.Code § 8–1–2–58. If an investigation reveals that a public utility's practices or acts are unreasonable, unsafe, insufficient, discriminatory, inadequate, or otherwise unlawful, the IURC may "by order fix just and reasonable" practices and acts. Ind.Code § 8–1–2–69. In addition, Ind.Code § 8–1–2–113(a) reads:

The commission may, when it considers necessary to prevent injury to the business or interests of the people or any public utility of this state in case of any emergency to be judged by the commission, temporarily alter, amend, or *with the consent of the public utility concerned, suspend* any existing rates, *service,* practices, schedules, and order relating to or affecting any public utility or part of any public utility in this state. The alterations, amendments, or suspensions of the rates, service, schedules, or practices made by the commission shall apply to one (1) or more of the public utilities in this state or to any portion thereof, as directed by the commission, and shall take effect at the time and remain in force for the length of time prescribed by the commission.

(emphasis added). However, the IURC may not enter an order affecting a public utility without holding a formal hearing. Ind.Code § 8–1–2–54. In the case of an emergency, a hearing need not be held before the IURC issues an order as long as a full hearing is held within a reasonable time and before the order becomes permanent. *Ind. Forge, Etc. v. Northern Indiana Pub. Service Co.,* 396 N.E.2d 910 (Ind.Ct.App.1979) *disapproved on other grounds by Austin Lakes Joint Venture v. Avon Utilities, Inc.,* 648 N.E.2d 641 (Ind. 1995) (adopting federal approach concerning the doctrine of primary jurisdiction).

Before conducting a formal hearing, the IURC may conduct prehearing conferences. Ind.Code § 8–1–2–47. Concerning prehearing conferences, the IURC has determined that their purpose is to formulate and/or simplify the issues, to determine whether to amend the pleadings, stipulate to certain facts, limit the number of witnesses, or address any other matter that may aid judicial economy. Ind. Admin. Code tit. 170, r. 1–1–16 (2001). After conducting a formal hearing, any order issued

by the IURC affecting the public utility must contain specific findings of fact supported by sufficient evidence introduced at the hearing. Ind.Code §§ 8–1–1–5; 8–1–3–1; *PSI Energy, Inc. v. Indiana OUCC,* 764 N.E.2d 769 (Ind.Ct.App.2002), *trans. denied.* Findings of fact are important because they help the reviewing court understand the IURC's reasoning and policy judgments and allow for a reasoned and informed basis of review, which decreases the likelihood that the reviewing court will substitute its judgment on complex evidentiary issues and policy determinations best left to an agency with technical expertise. *PSI Energy,* 764 N.E.2d 769. Further, requiring findings of fact helps the IURC avoid arbitrary and capricious action. *Id.*

■ We now turn to whether the IURC had the authority to issue an order temporarily enjoining NIPSCO from implementing its consolidation plan. As stated above, Ind.Code § 8–1–2–113 states that the IURC "may, when it considers necessary to prevent injury to the business or interests of the people or any public utility of this state in case of emergency to be judged by the IURC, temporarily suspend any existing rates, service, practices, or schedules of any public utility"; the suspension is conditioned upon the consent of the public utility. Therefore, the plain language of the statute makes clear that the IURC has the authority to suspend any existing service or practice if it determines an emergency exists and action must be taken to avoid injury to the public interest.

Even though the IURC has the authority to issue an order suspending certain practices, NIPSCO argues (1) that the IURC did not find that an emergency existed; (2) that there was only a plan to consolidate and no practice in existence to suspend; and (3) it did not consent to any suspension of an existing practice. The Petitioners counter that (1) there is no authority requiring an express finding of an emergency before enjoining NIPSCO; and (2) NIPSCO's consent was not required because the IURC was not suspending a practice, but merely requiring NIPSCO to maintain an existing level of service.

■ The parties' contentions raise the issue of whether the March 15, 2002 order was supported by specific findings of fact and sufficient evidence. When reviewing an IURC order, we first determine whether the decision is supported by specific findings of fact and by sufficient evidence. *Hancock County Rural Elec. Membership Corp. v. City of Greenfield,* 768 N.E.2d 909 (Ind.Ct.App.2002). Secondly, we consider whether the decision is contrary to law. *Id.* A decision is contrary to law when the IURC fails to stay within its jurisdiction and to abide by the statutory and legal principles that guide it. *Id.* "It is well settled that the authority of an agency to act is limited to that which is granted to it by statute." *Prior v. GTE North, Inc.,* 681 N.E.2d 768, 774 (Ind.Ct.App.1997), *trans. denied.*

■ Here, we find that the IURC properly found that an emergency existed and that it was supported by specific findings of fact and sufficient evidence.[3] In its order, the IURC noted the following: (1) the Petitioner's emergency petition alleged that implementation of NIPSCO's consolidation plan will prevent NIPSCO from providing reasonably adequate service and

---

**3.** One might argue that the length of time it has taken this case to reach the Court of Appeals does not indicate the existence of an emergency. However, it was undisputed at oral argument that NIPSCO sought numerous continuances throughout the administrative proceedings, which likely caused the delay.

facilities; (2) the emergency petition alleged that by closing certain LOAs, district sizes will increase resulting in life-threatening delays while employees retrieve repair equipment; (3) NIPSCO estimated that approximately 230 to 300 jobs will be eliminated; (4) the emergency petition alleges that NIPSCO has already begun laying off employees in anticipation of its consolidation plan; (5) the affidavits of Marlow Harmon, President of the LaPorte County Board of Commissioners (stating that his constituents are concerned about the increasing response time of NIPSCO service crews), Goble (concerning the power failure that occurred at LaPorte City Hospital), and Essig (citing that the number of NIPSCO customers has increased while the number of employees has decreased) were attached to the emergency petition, along with NIPSCO's letters to the Indiana Department of Workforce Development and United Steelworkers of America informing those organizations of the consolidation plan.

The IURC then concluded:

Pending the Commission's preliminary review of the of the [sic] issues in this matter, [NIPSCO] shall cease taking any actions in furtherance of its planned maintenance office closings and service district expansions contained in the consolidation plan. Based on our review of the Emergency Petition and the Supporting Affidavits, and pursuant to Ind. Code §§ 8–1–2–54, Ind.Code 8–1–2–58, and Ind.Code 8–1–2–113, the Commission hereby schedules a Prehearing Conference and Preliminary Hearing....

(App.I, p. 29).

 While the IURC's findings are not a model for Commission action, they are adequate when viewed in the context of the temporary and emergency nature of the action taken. As long as the record indicates that the IURC's decision has a reasonably sound basis of evidentiary support, we will not reweigh the evidence or substitute our judgment for that of the IURC. *Indiana Office of Utility Consumer Counselor v. Lincoln Utilities, Inc.,* 784 N.E.2d 1072 (Ind.Ct.App.2003). Here, the IURC has outlined a series of facts supporting its decision to suspend NIPSCO's consolidation plan as affecting a change in service to the public, including the fact that NIPSCO had begun laying off employees. The IURC is clearly concerned that the closure of the LOAs and reduction in personnel might affect NIPSCO's ability to extend service to the public. As used in Ind.Code § 8–1–2–113, "service" is defined

in its broadest and most inclusive sense and includes not only the use or accommodation afforded consumers or patrons but also any product or commodity furnished by any public or other utility and the plant, equipment, apparatus, appliances, property, and facility employed by any public or other utility in performing any service or in furnishing any product or commodity and devoted to the purposes in which such public or other utility is engaged and to the use and accommodation of the public.

Ind.Code § 8–1–2–1(e). As a result, there were specific findings of fact and sufficient evidence to support the IURC's March 15, 2002 order, and the April 24, 2002 order adopting it.

 Notwithstanding the IURC's authority to suspend the implementation of the consolidation plan, NIPSCO argues that it did not consent to the suspension of its plan. Because its consent is required under Ind.Code § 8–1–2–113, NIPSCO argues that the order is still invalid. Arguably, NIPSCO may be correct if it had not entered into the stipulated agreement. However, under the agreement, NIPSCO had conditionally agreed to restore the LOAs to the state that existed on March 1,

2002 and to be bound by the terms of the preliminary injunction. As a result, we find that the IURC's failure to seek NIPSCO's consent before suspending the implementation of its consolidation plan is harmless error.

### 3. Trial Court's Jurisdiction

NIPSCO also appeals the trial court's granting of a preliminary injunction in aid of the IURC's order. Specifically, NIPSCO argues that because the IURC did not have the statutory authority to issue an injunction, the trial court also lacked jurisdiction to issue a preliminary injunction.

■■■ Generally, trial courts do not have subject matter jurisdiction to issue a permanent injunction before a party has sought a remedy available through an administrative agency. *Northern Indiana Pub. Service v. Dozier,* 674 N.E.2d 977 (Ind.Ct.App.1996). However, the Indiana Supreme Court has held that

> courts may impose *temporary* equity in aid of an administrative agency's jurisdiction to assist the agency in preserving the status quo, or to promote the public interest, until the administrative question has been determined. The action in such cases, however, is to protect, rather than defeat, the jurisdiction of the particular agency. Accordingly, if the trial court is presented with an emergency situation, it may then enter a temporary order, but it may not invoke permanent equity when the legislature has provided a statutory remedy consisting of an administrative agency created for the express purpose of regulating and controlling service by public utilities.

*Decatur County R.E.M.C. v. Public Service Co.,* 150 Ind.App. 193, 275 N.E.2d 857, 862 (1971) (emphasis in original) (citations omitted). "Status quo has been defined as the 'last, actual, peaceful and non-contest-ed status which preceded the pending controversy.'" *Northern Indiana Pub. Service,* 674 N.E.2d at 987 (quoting *Rees v. Panhandle Eastern Pipe Line Co.,* 176 Ind.App. 597, 377 N.E.2d 640, 646 (Ind.Ct. App.1978)).

■■■ Here, the trial court had jurisdiction to issue a preliminary injunction in aid of IURC's subject matter jurisdiction and the issuance of its March 15, 2002 temporary order. It properly limited the duration of the preliminary injunction to the time it takes for the IURC to determine whether NIPSCO's consolidation plan satisfies its statutory and regulatory obligations as a public utility. As we have already found that the IURC properly exercised subject matter jurisdiction, thus, the trial court also had jurisdiction to aid the IURC in preserving the status quo or to promote the public's interest until the administrative question could be determined.

Affirmed.

SULLIVAN, J., and BAKER, J., concur.