

**FILED**

Feb 19 2019, 8:38 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jennifer A. Washburn
Margo Tucker
Citizens Action Coalition of Indiana,
Inc.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Robert E. Heidorn
P. Jason Stephenson
Vectren Corporation
Evansville, Indiana

Wayne C. Turner
Patrick A. Ziepolt
Hoover Hull Turner LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Citizens Action Coalition of Indiana, Inc., | February 19, 2019 |
| *Appellant-Intervenor*, | Court of Appeals Case No. 18A-EX-140 |
| v. | Appeal from the Indiana Utility Regulatory Commission |
| Southern Indiana Gas & Electric Company d/b/a Vectren Energy Delivery of Indiana, Inc., | The Honorable David E. Ziegner, Commissioner |
| *Appellee-Petitioner*. | The Honorable Loraine L. Seyfried, Chief Administrative Law Judge |
| | IURC Cause No. 44927 |

**Brown, Judge.**

Southern Indiana Gas & Electric Company d/b/a Vectren Energy Delivery of Indiana, Inc. ("Vectren South" or "Petitioner") filed a petition with the Indiana Utility Regulatory Commission ("Commission") seeking approval of its energy-efficiency Electric Demand Side Management[1] ("DSM") Plan for 2018-2020 ("Plan"). Citizens Action Coalition of Indiana, Inc. ("CAC") intervened in the proceeding. Following an evidentiary hearing, the Commission issued its decision ("Order") that approved the Plan in its entirety, including a revised lost revenue recovery proposal that Vectren South had presented. CAC now appeals from the Commission's Order, raising the following issues which we restate as follows:

> I. Whether the Commission's Order is contrary to law;
>
> II. Whether the Commission's Order impermissibly deviates from precedent;
>
> III. Whether the Commission's Order is supported by substantial evidence; and
>
> IV. Whether the Commission's approval of Vectren South's energy efficiency goals is improper.

We affirm.

---

[1] According to Vectren South, Demand Side Management programs "are designed to reduce electricity consumption at a certain time – typically the time when customers are collectively maximizing demand on the electric system." Appellee's Brief at 10 n.2.

## Facts and Procedural History

Vectren South is a public utility based in Evansville that provides electric utility service to approximately 140,000 customers in six counties in southwestern Indiana. In 2015, the General Assembly passed a statute, Indiana Code § 8-1-8.5-10 (2015) ("Section 10"), requiring electricity suppliers[2] to (among other things) periodically present to the Commission energy efficiency ("EE") plans, goals, and programs[3] for approval by the Commission beginning no later than 2017. *See* Ind. Code § 8-1-8.5-10(h). The statute specifically provides as follows:

> (h) Beginning not later than calendar year 2017, and not less than one (1) time every three (3) years, an electricity supplier shall petition the commission for approval of a plan that includes:
>
>> (1) energy efficiency goals;

---

[2] "Electricity supplier" means a public utility "that furnishes retail electric service to customers in Indiana." Ind. Code § 8-1-8.5-10(a). The term does not include a municipally owned utility and certain other corporations. *Id.*

[3] "Energy efficiency" means "a reduction in electricity use for a comparable level of electricity service." Ind. Code § 8-1-8.5-10(b). "Energy efficiency goals" means "all energy efficiency produced by cost effective plans that are: (1) reasonably achievable; (2) consistent with an electricity supplier's integrated resource plan; and (3) designed to achieve an optimal balance of energy resources in an electricity supplier's service territory." Ind. Code § 8-1-8.5-10(c). "Energy efficiency program" or "program" means "a program that is: (1) sponsored by an electricity supplier; and (2) designed to implement energy efficiency improvements. The term does not include a program designed primarily to reduce demand for limited intervals of time, such as during peak electricity usage or emergency conditions." Ind. Code § 8-1-8.5-10(d). According to Vectren South, energy efficiency ("EE") programs "are sometimes called demand side management, or DSM, programs." Appellee's Brief at 10 n.2.

(2) energy efficiency programs to achieve the energy efficiency goals;

(3) program budgets and program costs; and

(4) evaluation, measurement, and verification [("EM&V")[4]] procedures that must include independent evaluation, measurement, and verification.

An electricity supplier may submit a plan required under this subsection to the commission for a determination of the overall reasonableness of the plan[5] either as part of a general basic rate proceeding or as an independent proceeding. . . .

*Id.*

[3]     As an incentive for participation, the General Assembly included provisions within the statute allowing electricity suppliers, such as Vectren South, to recover certain costs associated with their EE plans, including lost revenues.[6]

---

[4] "Evaluation, measurement, and verification (EM&V) is the collection of methods and processes used to assess the performance of energy efficiency activities so planned results can be achieved with greater certainty and future activities can be more effective." DEPT. OF ENERGY, EVALUATION, MEASUREMENT, AND VERIFICATION OF ENERGY DATA, https://www.energy.gov/eere/slsc/evaluation-measurement-and-verification-energy-data (last visited Jan. 15, 2019).

[5] In determining the overall reasonableness of the plan, the Commission is required to consider ten factors. *See* Ind. Code § 8-1-8.5-10(j).

[6] Lost revenues can be described as: "the fixed costs previously approved by the Commission and included in rates that are not recovered as a result of the implementation of EE programs." Exhibits Volume 2 at 102. According to Vectren South, "the purpose of recovery of lost [revenue] on verified energy savings from DSM programs is to return the utility to the position it would have been in absent implementation of a DSM measure." *Id.* (internal quotations and emphasis omitted).

*See* Ind. Code § 8-1-8.5-10(o) ("If the commission finds a plan submitted by an electricity supplier under subsection (h) to be reasonable, the commission shall allow the electricity supplier to recover or receive the following: . . . (2) Reasonable lost revenues."). As explained by Vectren South: "When ratepayers use less electricity, because of energy efficiency programs, they are saving money. The utility is similarly losing revenue due to decreased sales of electricity." Appellee's Brief at 11. The instant case stems from the Commission's approval of Vectren South's Plan in its entirety, including Vectren South's revised proposal to recover lost revenue.

[4]    On April 10, 2017, Vectren South filed a petition with the Commission seeking approval of its Plan, which outlined Vectren South's EE programs and their budgets and costs. The Plan had an estimated cost of $28.6 million, with $9.5 million in 2018, $9.6 million in 2019, and $9.5 million in 2020. The Plan included a portfolio of programs designed to achieve 111 million kilowatt hours ("kWh") in energy savings and 26 thousand kilowatts ("kW") in demand reduction during the three-year period. The Plan also included a request for approval to recover, over the life of the measure,[7] lost revenues resulting from

_____

[7] "Measure" is defined in pertinent part as "[s]pecific energy efficiency activities or equipment." DEPT. OF ENERGY, ENERGY EFFICIENCY & RENEWABLE ENERGY 1, https://www.energy.gov/sites/prod/files/2014/05/f16/what_is_emv.pdf (last visited Jan. 15, 2019).

"Measure life" is widely defined as "the average/median life over many data points, or customer experiences, of a particular EE program. It takes into consideration variations in the useful life of an EE measure among different types of customers by developing an average. [For example, a]n LED could last 5 years in one home, 11 years in another and 30 years in another – with an average of 15 years." Exhibits Volume 7 at 13.

reduced demand for electricity ("Original Lost Revenue Proposal").  On April 10, 2017, CAC filed a petition to intervene, which was granted on May 2, 2017.

[5]     At some point during the proceedings, Vectren South withdrew its Original Lost Revenue Proposal and submitted a revised proposal for the recovery of lost revenue ("Revised Lost Revenue Proposal") that would allow recovery of lost revenues over twelve years.  The Revised Lost Revenue Proposal was described as follows in the Commission's Order through testimony provided by Rina H. Harris ("Ms. Harris"), Director of Energy Efficiency for Vectren Utility Holdings, Inc., at an evidentiary hearing held by the Commission on September 6, 2017:[8]

> Petitioner seeks authority to implement lost revenue recovery based upon the WAML[, the weighted averaged measure life,] of all programs included in the 2018-2020 Plan, with a 10% reduction in annual savings.  Under this method, Vectren South would recover the amount of lost revenues associated with the WAML of its EE programs or the measure life, whichever is less. The WAML is the average life, weighted by savings in years, of all the various measures installed or actions taken in a portfolio of programs.  [Ms. Harris] said that capping recovery of lost revenues based upon WAML is reasonable because it limits lost revenue recovery based on the average equipment life and measure persistence of the entire Plan.  In addition, only 90% of annual savings would be recovered, reflecting the statistical certainty EM&V providers can obtain for lost revenues.  She said that . . . the EM&V process utilizes at minimum a 90%

---

[8] During this proceeding, the Commission heard evidence from Vectren South, from statutory party Indiana Office of Utility Consumer Counselor ("OUCC"), and from CAC.

confidence interval (an industry accepted standard).  She testified that all inputs in the WAML (less 10% for statistical certainty) are grounded on evaluation and Technical Re[source] Manuals[9] and provide a methodical cap to lost revenue recovery.

* * * * *

Ms. Harris testified that for the Plan, the WAML approach would reduce lost revenue recovery by approximately $18.8 million over the life of the programs included in the Plan as compared to recovery using full measure life [under the Original Lost Revenue Proposal].  [Under the Revised Lost Revenue Proposal, l]ost revenues would be reduced by 26% with a 12-year weighted average cap plus 10% savings reduction.

Appellant's Appendix Volume 2 at 13.  Vectren South predicted that "its lost revenue due to measures implemented in the 2018-2020 energy efficiency plan will be $73.6 million."  Appellee's Brief at 21.  However, it maintained that, under the Revised Lost Revenue Proposal, it was not seeking to recover its estimate of $73.6 million, but rather "only about $54.8 million, or $18.8 [million] less . . . ."  *Id.* at 22.

[6]  CAC argued for Vectren South's lost revenue collection to be capped at the lesser of four years or the Plan's measure life.  A witness for CAC, Karl R. Rábago ("Mr. Rábago"), the principal of Rábago Energy, LLC, testified that

---

[9] Per testimony provided at the evidentiary hearing, the Indiana Technical Resource Manual ("TRM") is an essential document "for EM&V activities and for the calculation of lost revenues."  Exhibits Volume 8 at 139.

"[b]y capping the lost revenue recovery at the lesser of [four] years or the life of the measure, this mitigates the Pancake Effect [(the cumulative effect of lost revenues over time on rates)]." Exhibits Volume 8 at 128. He explained that "the problems of 'pancaking' and 'piece-meal' or 'single-issue' ratemaking create serious problems of fairness and reasonableness if a [lost rate adjustment mechanism ("LRAM")[10]] is used for the entire useful life of the energy efficiency measures." *Id*. at 132. He further explained that "although pancaking and piece-meal rate making problems can arise over any term between rate cases, the amount of pancaking that will occur with a four-year cap is reasonable because: A term greater than four years will create unreasonable difficulty in tracking the pancake effect over time." *Id*. at 130. He urged the Commission to find that four years is the maximum reasonable term for an LRAM "before the utility must present any remaining claimed lost revenues in a base rate case . . . ." *Id*. He maintained that beyond four years, the LRAM "would be subject to some volatility, as measures exited due to end of useful life, and as new lost revenue collections were added due to subsequent [p]lan approvals." *Id*. at 132. He disagreed with Vectren South's claim that a four-year cap would create a perverse incentive for the utility to favor programs

---

[10] "Lost Revenue Adjustment Mechanism (LRAM) is a rate adjustment mechanism that allows the utility to recover revenues that are 'lost' due to energy savings from approved efficiency programs." Sara Hayes et al., *Balancing Interests: A Review of Lost Revenue Adjustment Mechanisms for Utility Energy Efficiency Programs*, 1 (September 2011) American Counsel for an Energy-Efficient Economy, https://aceee.org/sites/default/files/publications/researchreports/u114.pdf (last visited Jan. 15, 2019).

with shorter-term useful lives to avoid the risk of under-recovery of lost revenues.

[7] Mr. Rábago maintained that Vectren South's WAML approach to the recovery of lost revenues comes with its own set of problems. He explained:

> The weighted average measure life is a mathematical solution to the rate volatility that results from long-term pancaking of an [LRAM], but potentially creates greater problems in terms of rate fairness. That is, the method would "smooth out" year to year volatility in the later years of the portfolio useful life by use of an averaging calculation. But without much more analysis and modeling, there is no way to tell if the proposed method limits recovery of lost revenues to reasonable and fair levels.

*Id*. at 137.

[8] He compared the dollar amounts between Vectren South's Original Lost Revenue Proposal, the Revised Lost Revenue Proposal, and CAC's proposal to cap lost revenue recovery at four years or the life of the measure, whichever is shorter. He determined that, under Vectren South's Original Lost Revenue Proposal, ratepayers would pay $73.6 million in lost revenues for a program that costs $28.6 million to implement, and that although the total amount of lost revenues under the Revised Lost Revenue Proposal would be less, $54.8 million, "[t]he pancake effect still exits, and the sheer total of lost revenues presented here at $54 million for just $28 million of actual program delivery is unreasonable." *Id*. at 127. Mr. Rábago further testified that under CAC's four-year-cap proposal, total lost revenues would amount to $21.8 million. He

disagreed with Vectren South's position that the role of lost revenue recovery is to put a utility in the same revenue position it would have been in but for the implementation of EE measures. He testified that "the purpose of lost revenue recovery is to provide reasonable mitigation of the direct and causally-connected revenue losses resulting from utility sponsored [EE] programs and measures." *Id*. at 121.

[9] CAC also argued that testimony from a Vectren South witness, Dr. M. Sami Khawaja ("Dr. Khawaja"), Chief Economist at The Cadmus Group (an energy efficiency evaluation firm), created a conflict of interest and should be disregarded because The Cadmus Group had been retained by Vectren South to perform evaluation services for the past eight years. According to CAC, Section 10 requires that the EM&V procedures be independent, and that Dr. Khawaja's advocacy position "in this proceeding . . . casts doubt on the integrity of the firm's work as an independent evaluator." *Id*. at 139.

[10] On December 28, 2017, the Commission issued its twenty-eight-page Order, concluding in relevant part that "[b]ecause we approve Vectren South's 2018-2020 Plan, we find that Vectren South shall be authorized to recover its associated program costs, including . . . lost revenues based upon the WAML less 10% reduction in savings . . . ." Appellant's Appendix Volume 2 at 35. The Order reads in pertinent part:

> Historically, lost revenues in Indiana (and across the country) have been recovered based on a measure's [effective useful life ("EUL")] and the energy savings confirmed by EM&V. The

purpose of allowing lost revenue recovery is to assist in removing any disincentive a utility may have in promoting DSM, as opposed to pursuing a supply-side resource. *See*, *Indianapolis Power & Light Co.*, Cause No. 43911 (IURC Nov. 4, 2010); 170 IAC 4-8-3.

Vectren South initially requested approval to recover lost revenue for the life of each EE measure implemented pursuant to the 2018-2020 Plan. However, Petitioner subsequently modified its request and now seeks approval to recover lost revenues based upon the WAML of the Plan programs with a 10% reduction in savings to account for measure persistence. The effect of this change is to reduce lost revenue recovery based strictly on measure lives by 26% or $18.8 million. Thus, under the modified approach, Vectren South would recover approximately $54.8 million of lost revenues over the 12-year WAML of the Plan.

Both the OUCC and CAC encouraged the Commission to reject Vectren South's WAML proposal. CAC recommended the use of a four-year cap on lost revenue recovery. CAC argues this recovery is reasonable because a term greater than four years creates unreasonable difficulties in tracking the accuracy of lost revenues, the pancaking or cumulative effect of lost revenues over time on rates, and lost revenue policies were created at a time when the period between rate cases was shorter. . . .

Under the modified proposal, Vectren South would recover the amount of lost revenues associated with the WAML of the Plan portfolio of programs or the measure life of the EE program, whichever is shorter. Dr. Khawaja explained that it was appropriate to cap lost revenue based on the WAML because lost revenue will take place for the duration of the measure life. The WAML is based on the EUL, which is the median of a measure's life. Dr. Khawaja testified that the EUL values used by Petitioner are conservative for an overall WAML of 12 years. Further, the proposed 10% reduction in annual energy savings

reflects the use of the lower end 90% confidence level estimate of savings and equates to an even more conservative [10.7-year] measure life cap.

In addition to the use of the 12-year WAML, Vectren South proposes to recover only 90% of the annual energy savings. CAC and other parties, in their post-hearing filing, argue that because EM&V is only conducted once for each Plan year, the initial determination of energy savings and lost revenue becomes progressively less reliable and more uncertain in successive years and therefore should not be relied upon. Further, they argue that the proposed 10% reduction in energy savings only addresses the degree of confidence in the threshold EM&V determination, not the eroding reliability of assumed savings.

EM&V is the most established approach to reasonably estimating energy savings and lost revenues associated with EE programs. Vectren South's approach appears reasonably designed to ensure it recovers only the lost revenues that EM&V can establish, with a high degree of confidence, will result from savings driven by EE measures. Recognizing that estimates are more certain in the immediate (as opposed to the distant) future, Vectren South's evaluation process for estimating net energy savings utilizes at minimum a 90% confidence interval and supports a 10% degradation of annual savings within its lost revenue calculation, which results in a statistically conservative estimate. While we recognize that EM&V degrades over time based on accumulating changes, this degradation is built into the EM&V process. We further find that the approximate 26% reduction in recovered lost revenues compared to Petitioner's initial proposal is intended to strike a reasonable balance in terms of offsetting the inherent financial harm to a utility caused by EE sales reductions, while also ensuring the recoveries are fully supported by conservative EM&V estimates that safeguard the cost and benefit analysis relied upon to determine that the EE Plan provides short- and long-term benefits to customers.

As indicated above, CAC offered no basis on which we could make factual findings that a four-year cap would allow Vectren South to recover reasonable lost revenues. In fact, Ms. Harris testified that implementing a four-year cap on the Plan would cause approximately $52 million of financial harm to Vectren South in lost revenues over the life of the programs, which equates to approximately 70% of lost revenues. Rather than providing a reasoned explanation or analysis to support ending lost revenue recovery after four years regardless of measure life or evidence related to the financial effects of such a proposal on Petitioner, CAC instead offers a conclusory opinion that the magnitude of lost revenues exceeds the program costs and therefore this must result in it being an unreasonable proposal. CAC provided no factual basis to support its contention that lost revenues should not exceed program costs. It is inherent that energy savings validated by EM&V will create lost revenues. Consequently, cost-effective EE programs should have lower programs costs with larger energy savings, which does result in higher lost revenues relative to program costs.

* * * * *

Accordingly, we find that Vectren South's modified lost revenue recovery proposal, which has a strong nexus to the EM&V process, will allow the recovery of reasonable lost revenues. Our conclusion is consistent with the Commission's DSM rules at 170 IAC 4-8 and Section 10's requirement that EM&V are included in any EE plan. Section 10(o) similarly recognizes the importance of subjecting lost revenues to EM&V in its reconciliation requirements when using forecasted data. Vectren South's proposal recognizes that the EM&V process is not an exact science [] and employs limitations on EM&V quantification of savings (and thus lost revenues) that assures customers are billed for lost revenues based on a conservative determination of achieved savings to ensure the highest level of confidence in the energy savings that are attributed to EE

measures. Neither CAC nor the OUCC provided us with sufficient evidence demonstrating that Vectren South's proposal is unreasonable. Nor did they provide us with sufficient facts from which we could determine that either of their alternative proposals for caps on lost revenue recovery would allow Vectren South to recover reasonable lost revenues. Therefore, we find Vectren South's modified proposal for lost revenue recovery is reasonable.

Appellant's Appendix Volume 2 at 31-33 (footnote omitted).

[11]     Regarding whether testimony from Dr. Khawaja should have been disregarded, the Commission determined that:

> Dr. Khawaja's testimony was largely limited to addressing the reasonableness of EM&V results over time and how the issues of uncertainty and persistence are accounted for in the EM&V process and methodology. While it may have been more prudent for Petitioner to retain an EM&V witness not associated with Cadmus, we lack sufficient evidence to find that EM&V independence has been undermined – particularly given another request for proposals is planned to select an EM&V vendor to evaluate the 2018-2020 Plan and the ongoing participation by members of the [Vectren Oversight Board[11]] in the review of the EM&V analysis and reports.

*Id*. at 28. CAC now appeals the Commission's Order.

---

[11] The Vectren Oversight Board is Vectren South's EE program governance body. Both CAC and OUCC are voting members of the Board.

## Discussion

### Standard of Review

[12] The General Assembly created the Commission primarily as a factfinding body with the technical expertise to administer the regulatory scheme devised by the legislature. *N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind. 2009). The Commission's assignment is to insure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana. *Id.* "The Commission can exercise only power conferred upon it by statute." *Id.* "Because the complicated process of ratemaking is a legislative rather than judicial function, it is more properly left to the experienced and expert opinion present in the Commission." *Citizens Action Coal. of Ind., Inc. v. N. Ind. Pub. Serv. Co.*, 76 N.E.3d 144, 151 (Ind. Ct. App. 2017) (internal quotations omitted).

[13] Indiana Code § 8-1-3-1 (1993) authorizes judicial review of Commission orders by this Court. The review involves multiple tiers. *U.S. Steel*, 907 N.E.2d at 1016. "On the first level, it requires a review of whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. Such determinations of basic fact are reviewed under a substantial evidence standard, meaning the order will stand unless no substantial evidence supports it." *Id.* (citation and footnote omitted). We neither reweigh evidence nor assess witness credibility, and we consider only the evidence favorable to the Commission's findings. *Id.* The Commission's order is not binding if it lacks substantial evidence supporting the findings of the Commission or is unreasonable or arbitrary. *Id.*

"At the second level, the order must contain specific findings on all the factual determinations material to its ultimate conclusions." *Id.* We review the Commission's conclusions of ultimate facts for reasonableness, the deference of which is based on the amount of expertise exercised by the agency. *Id.* If the order involves a subject within the Commission's special competence, we should give it greater deference; if the subject is outside the Commission's expertise, we give it less deference. *Id.* "More specifically, on matters within its jurisdiction, [the Commission] enjoys wide discretion and its findings and decision will not be lightly overridden simply because we might reach a different decision on the same evidence." *Citizens Action Coal. of Ind., Inc.*, 76 N.E.3d at 151 (brackets and internal quotation omitted). "Essentially, so long as there is any substantial evidence to support the rates as fixed by the Commission as reasonable, the judicial branch of the government will not interfere with such legislative functions and has no power or authority to substitute its personal judgment for what it might think is fair or reasonable in lieu of [the Commission's] administrative judgment." *Id.* (brackets, emphasis, and internal quotations omitted).

Findings of fact are important because they help us understand the Commission's reasoning and policy judgments and allow for a reasoned and informed basis of review, which decreases the likelihood that we will substitute our judgment on complex evidentiary issues and policy determinations best left to an agency with technical expertise. *N. Ind. Pub. Serv. Co. v. LaPorte*, 791

N.E.2d 271, 278 (Ind. Ct. App. 2003). Further, requiring findings of fact helps the Commission avoid arbitrary and capricious action. *Id.*

[16] "Additionally, an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order." *U.S. Steel*, 907 N.E.2d at 1016.

### *I. Whether the Commission's Order is Contrary to Law*

[17] CAC's first argument is twofold. It contends that the Commission's Order is contrary to law because the approval of Vectren South's Revised Lost Revenue Proposal is unreasonable, and that it is inconsistent with Section 10. We address each argument in turn.

### *A. Whether the Approval of the Revised Lost Revenue Proposal is Unreasonable*

[18] CAC maintains that the Commission should have reviewed Vectren South's overall financial condition when it determined whether the Revised Lost Revenue Proposal was reasonable and just. The crux of CAC's argument is that:

> [b]ecause the Commission[, in approving the Revised Lost Revenue Proposal,] has ignored the requirement that each utility's rates must be set on the utility's overall financial condition including total revenue and expense, the approval of Vectren [South]'s lost revenue rate recovery in the Order is not

just and reasonable, and should be declared unlawful by this Court.

Appellant's Brief at 29. According to CAC:

> The lost revenue rate approved in the Order [] was set merely on a forecasted estimation of the amount of lost sales attributable to the energy efficiency programs from an evaluation vendor with no cogent reference to the utility's overall financial condition. The approved lost revenue rate in the Order just guarantees rate recovery based on projected savings without any consideration for other ratemaking principles. It also disregards the distinction between a utility who comes in for regular rate cases, regularly zeroing out lost revenue totals when resetting rates, versus a utility who does not reset rates but for once every 10, 15, 20 years, resulting in exorbitant lost revenue rate recovery and millions of dollars in difference in terms of what the ratepayers is [sic] required to pay.

*Id*. at 28. CAC also argues that to allow Vectren South to recover the requested amount dissuades Vectren South from filing general rate cases.[12]

[19] CAC further argues that the Revised Lost Revenue Proposal is unreasonable because it allows Vectren South to recover $54.8 million in lost revenue for EE

---

[12] CAC posits that the approval of lost revenues is subject to a "just and reasonable" rates standard under Indiana Code § 8-1-2-4 (1984), the general rate statute, which provides in relevant part that "[t]he charge made by any public utility for any service rendered or to be rendered either directly or in connection therewith shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful." However, in its Surreply Brief, CAC clarifies that in referencing the statute, it was not raising a new argument. It acknowledges that it should have been more careful with its phrasing, but that "the point . . . is this: by failing to consider its precedent of capping the time a lost revenue rate adjustment mechanism may be used due to Indiana's environment of infrequent rate cases, the Commission brings the just and reasonable rates requirement from I.C. § 8-1-2-4 and the examination of the utility's overall financial condition to the forefront . . . ." Appellant's Surreply Brief at 6.

programs projected to cost $28.6 million to administer. It states that "lost revenue rates at 1.9 times greater than the cost to actually run the programs is far in excess of what is necessary to satisfy a monopoly utility's shareholders' *legitimate* expectations." *Id*. at 26. CAC claims that "[t]his lost revenue guaranteed rate is outside the zone of reasonableness in light of the legal framework, ratemaking policy, regulatory history, objective of the required cost-effectiveness in the statute, and the appropriate degree of reliability in forecasting estimated savings out beyond a few immediate years." *Id*. CAC contends that "[i]t is particularly wasteful and results in artificially high prices to award a utility 1.9 times more in revenue than costs to run the energy efficiency programs with no shown correlation that this extra revenue will equate to more energy efficiency services or savings." *Id*. at 27.

[20] We are not persuaded by CAC's arguments. Section 10(j)(8) provides that when the Commission makes a determination of the overall reasonableness of a plan, it must consider the lost revenues and financial incentives associated with the plan and sought to be recovered or received by the utility. Section 10(o) provides that if the Commission finds a plan submitted by a utility to be reasonable then the Commission must allow the utility to recover or receive reasonable lost revenues. Here, the Commission considered the lost revenues sought to be recovered and determined that CAC "provided no factual basis to support its contention that lost revenues should not exceed program costs." Appellant's Appendix Volume 2 at 33. Furthermore, Section 10 does not require the Commission to consider a utility's overall financial condition in

determining whether lost revenues sought to be recovered are reasonable or whether recovery of the requested lost revenue dissuades Vectren South from filing general rate cases.[13]  As such, the Commission did not act contrary to law in determining that Vectren South's Plan was reasonable.

### B. Whether the Approval of the Revised Lost Revenue Proposal is Inconsistent with Section 10

[21]     CAC also argues that the Commission's approval of the Revised Lost Revenue Proposal is inconsistent with Section 10.  It contends that the Commission's Order "misinterprets and misconstrues" that section "establishing rates under Section 10 without any reference or consideration of ratemaking practices and the requirements of Indiana's Public Service Commission Act ('PSCA')." Appellant's Brief at 36.  CAC specifically argues that "the most basic error is the Commission's failure to reconcile its approval of [the Revised Lost Revenue Proposal] without any reference or application of ratemaking practices" and the Commission's failure to "consider ratepayers in making a determination as to the reasonableness of this rate."  *Id.*

[22]     We observe that the requirement under Section 10 that electricity suppliers file a three-year EE plan was adopted by our General Assembly in 2015 as a separate

---

[13] *Cf. NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.*, 100 N.E.3d 234, 238 (Ind. 2018) ("*General ratemaking* is a 'comprehensive' process, requiring the Commission to 'examine every aspect of the utility's operations and the economic environment in which the utility functions to ensure that the data [the Commission] has received are representative of operating conditions that will, or should, prevail in future years.'" (emphasis added and citation omitted)), *modified on reh'g*.

requirement that is *in addition to* long-standing requirements regarding general ratemaking. CAC points to no relevant authority indicating that the Commission was required to consider or apply procedures adopted in connection with general ratemaking cases when considering a petition filed in accordance with Section 10. CAC has failed to establish that the Commission's approval of Vectren South's Revised Lost Revenue Proposal is inconsistent with Section 10. We therefore find that the Commission's approval of the Revised Lost Revenue Proposal was not inconsistent with Section 10 and was not contrary to law.

## II. *Whether the Commission's Order Impermissibly Deviates from Precedent*

We next address whether the Commission impermissibly deviated from precedent. CAC maintains that the Commission's Order "ignores available precedent related to the relationship between lost revenues and general rate cases that articulated principles by which to ascertain the reasonableness of lost revenue recovery proposals." *Id*. at 29. According to CAC, "the relationship between rate cases and lost revenues, as articulated in the available precedent, was a material issue raised and put in dispute by the parties before the Commission in this proceeding, but it went unaddressed." *Id*.

In support of its argument, CAC cites to four Commission decisions. *See In re Ind. Power & Light Co.*, Cause No. 43911, 2010 WL 4499412, at *9 (November 4, 2010) (denied lost revenue recovery "in the absence of a base rate case to ensure that class specific investment and investment recovery is properly aligned"); *In re N. Ind. Pub. Serv. Co.*, Cause No. 43912, 2011 WL 3346770, at

*22 (July 27, 2011) (denied request to recover lost margins but remained "willing to consider a request for lost margins provided NIPSCO can demonstrate the revenue margin rates are reasonably reflective of today's operations"); *In re N. Ind. Pub. Serv. Co.*, Cause No. 44634, 2015 WL 9605053, at *42, 43 (December 30, 2015) (Commission acknowledged that it had "previously approved lost revenues over a measure's life or until a utility's next base rate case, whichever is shorter," but due to "concerns with pancaking and the increased length of time between base rate cases for utilities in Indiana," ultimately found NIPSCO's lost revenue recovery should be limited to "(1) four years or the life of the measure, whichever is less, or (2) until rates are implemented pursuant to a final order in NIPSCO's next base rate case, whichever occurs earlier."); *In re Duke Energy Ind., Inc.*, Cause No. 43955, 2016 WL 1118794 (March 16, 2016) (denied approval of Duke's EE plan, finding, in part, that recovery of lost revenues should be limited to a four-year term). However, nothing in our review of these decisions leads us to the conclusion that reversal is required in this case.

[25]   By its own acknowledgement, the Commission has previously approved the recovery of lost revenues over a measure's life or until the utility's next base rate case, whichever is shorter. The Commission has also previously approved a four-year cap on a utility's lost revenue recovery. An agency may change its course and is not forever bound by prior policy or precedent as long as it explains its reasons for doing so. *See Ind. Bell Tel. Co. v. Ind. Util. Reg. Comm'n*, 810 N.E.2d 1179, 1186 (Ind. Ct. App. 2004), *trans. denied*. In its Order, the

Commission found Vectren South's Plan to be reasonable in its entirety, found Vectren South's Revised Lost Revenue Proposal to be reasonable, and explained its reasons for doing so. The Commission did not impermissibly deviate from precedent.

### III. Whether Substantial Evidence Supports the Commission's Order

[26] CAC's next argument is that the Commission's Order "lacks a reasonably sound basis of evidentiary support." Appellant's Brief at 34. Specifically, CAC maintains that "[t]he most fundamental problem with the evidentiary support for the approved lost revenue rate is the fact that there is no credible evidence that the investor owned electric utility experienced its claimed level of lost revenues or that the rate was established based on other financial aspects of the utility." *Id*. CAC also argues that the Commission failed to consider the "relationship of the lost revenue rate with the resetting of rates in general rate cases"; the Order failed to "mention or weigh any of the critical cross-examination that was conducted by the other consumer parties"; and in reaching its determination, the Commission failed to consider the complete record. *Id*. at 34, 35. In addition, CAC claims that "[t]he reliance upon EM&V as a basis for approving lost revenue rates is nonsensical and not cost- or rates-based." *Id*. at 34. CAC argues that the Order "mischaracterizes the role of [EM&V] and what EM&V has done, does and does not do for lost revenue rate recovery." Appellant's Reply Brief at 13. We disagree.

It is expected that Vectren South would not present actual lost revenue amounts, as it was seeking pre-approval of the Plan and a request to recover *proposed* lost revenues. The evidence indicated that the lost revenues detailed at length by Vectren South were forecasted losses that would later be reconciled through EM&V. The Commission's Order accurately reflects this point and the required reconciliation. Furthermore, Section 10 does not require the Commission to consider the relationship between lost revenue rates and the filing of general rate cases.

We find that CAC's other arguments are an invitation for this Court to reweigh the evidence. The Commission reviewed the evidence of record and found the evidence presented by Vectren South to be more persuasive. We will not reweigh the evidence or reassess witness credibility on appeal. *See U.S. Steel*, 907 N.E.2d at 1016.

## *IV. Whether the Commission's Approval of Vectren South's EE Goals is Improper*

CAC's last argument concerns whether the Commission's approval of Vectren South's EE goals is improper because, according to CAC, the Commission failed to consider certain "[m]aterial [i]mpeaching [e]vidence" that was contained in the "Commission's Director's Draft Report." Appellant's Brief at 38, 39. CAC specifically maintains that:

> [T]he Commission cherry-picked certain parts from its relevant
> Director's Report but completely ignored the pertinent parts
> which impeached the very evidence upon which the Commission

relied to approve Vectren's level of energy efficiency investment in this case.

At a minimum, the Commission should have addressed its own Director's concern as to whether Vectren's "adjustments made to correct for admitted serious data limitations is sufficient to overcome the problems being addressed" and the Director's ultimate conclusion that "[d]rawing strong policy recommendations in such circumstances is probably not warranted." (Tr., [V]ol. 9, at 43). Instead, the Commission ignored these conclusions from its own Director, ignored the process it created to deal with most of the disputes over resource planning outside litigated cases (Appellant's-Br. at 10), and gave the investor-owned utility carte blanche for this important resource decision to the detriment of ratepayers and those parties who invested substantial time and resources in the Commission created process. (Order at 15-17).

Appellant's Reply Brief at 23.

[30] CAC's argument, essentially, is an invitation to reweigh the evidence, which we cannot do. The record contains substantial evidence supporting the Commission's determination that Vectren South's EE goals are reasonable.

[31] For the foregoing reasons, the Commission's Order is affirmed.

[32] Affirmed.

Najam, J., and Altice, J., concur.